———————o———————

## No. 3717.

### (Court of Appeal, Parish of Orleans.)

## THOMAS JACKSON HENDERSON VS. LOUISVILLE & NASHVILLE RAILROAD.

1. As a general rule the agent of a carrier who is authorized to issue bills of lading, has no authority to issue a bill of lading for goods which have not been delivered to the carrier; and, as a consequence, if the party to whom the bill of lading was given had no goods, or the goods described in the bill of lading are never delivered to the carrier, the bill of lading so issued in his hands, is, of course, void and cannot bind the principal.

2. But, if, in the usual course of business, the agent authorized to issue bills of lading, fraudulently or through mistake or negligence, and where no goods have been received for shipment, does issue a bill of lading and it comes into the hands of an innocent third person, a bona fide consignee or assignee for value, the carrier is estopped from explaining or contradicting the bill of lading and is, consequently, liable to the innocent third person thereon.

3. Where one or two innocent persons must suffer by the act of a third person the loss must fall upon the one of them who, by reposing confidence in, and granting to, the latter, has furnished him the means of doing the injury.

4. Where a principal has clothed his agent with power to do an act in case of the existence of some extrinsic fact, necessarily and peculiarly within the knowledge of the agent, and of the existence of which the act of executing the power is itself a representation, the principal is estopped from denying the existence of the fact, to the prejudice of a third person, who has dealt with the agent or

acted on his representation in good faith in the ordinary course of business.

5.   As between the principal and the agent the true limit of the agents authority to bind the former is the express authority or instructions given to the agent; but as between the principal and third persons the true limit is the apparent authority with which the agent is invested.

6.   The principal is bound by all the acts of his agent within the scope of the authority which he held him out to the world to possess, notwithstanding the agent acted contrary to instructions; and this is especially the case with officers and agents of corporations as the latter can act only by officers and agents.

7.   Bills of lading are made by the statute of 1868 (Act No. 150), negotiable "to the same extent as bills of exchange and promissory notes now are:" but even in the absence of statute so declaring them, they are viewed and dealt with by the commercial world as quasi negotiable, and consequently it is desirable that they should be viewed with confidence and not with distrust.

8.   The animus of the Statute of 1868 is unmistakable. It was intended to protect both the carriers and the public; the former by punishing any person in their employ for issuing false bills of lading or receipts, and the latter by putting such bills or receipts upon the same footing as commercial paper, and protecting the holder in good faith with all the privileges and immunities given to bills of exchange and promissory notes. Its enactment was in the interest of commerce; it created one of the most important branches of our credit; it secures the most legitimate transactions; it sanctioned, legalized and perfected a fair, but more imperfect custom, which prevailed before its adoption; it guards against carelessness and error, against surprise and fraud. If, as to innocent third persons for a valuable consideration, the bill of lading could be explained or contradicted, the very purpose of the Statute would be defeated, for though declared by the act to be negotiable it would be seldom, if ever, negotiable, for its verity could then not be relied on.

9.   This law in the interest of commerce, and in order to give security to business transactions, has thrown peculiar guards around the rights of persons advancing money on such bills. To allow the carrier to dispute the truth of his bills in the hands of innocent parties, who, in good faith, had advanced upon them, would be to destroy all confidence, upon which commerce so much depends.

10.   Notwithstanding the rule announced in the leading English case of Grant against Norwood, and which is followed by the Federal Courts, to the effect that whether the bill of lading be in the hands of the original party or in those of an innocent third person, the carrier is not bound thereon, when no goods had been delivered for shipment, we think the better opinion is that which obtains in a number of the sister states to the effect that as between the

carrier and a third person holding it for a valuable consideration, the bill of lading is not open to explanation or correction.

11. Hunt & Macaulay vs. Mississippi, etc., Railroad Co., 29 A., 446, apparently contrary to the views herein announced, shown to be merely elicited and the views of only a minority of the Court.

Appeal from Civil District Court, Division "D."

McCloskey & Benedict, for Plaintiff and Appellee.

Denegre & Blair, Victor Leovy, for Defendant and Apellant. lant.

MOORE, J.  Defendant is a common carrier corporation and one J. E. Eaves was its contracting agent in the City of New Orleans and as such duly authorized to issue bills of lading for goods delivered to the Company for carriage over its line.

On the 23rd day of February, 1904, Eaves, for and on behalf of defendant corporation, signed a bill of lading in the usual form of the company, acknowledging receipt from the firm of Drews & Harvey, who were sugar brokers in said City, of 100 barrels of sugar for carriage to Chicago, Illinois, consigned "to order; notify Sprague, Werner & Co.," which means for delivery at Chicago to whomsoever may be the holder of the bill of lading, endorsed by the consignor's, notice, however, of the arrival of the shipment at destination to be given by the carrier to Sprague, Werner & Co.

Upon delivery to them of this bill of lading, Drew & Harvey at once drew their sight draft on Sprague, Werner & Co. for $1,414.75, which they negotiated with plaintiff, also a sugar broker, or dealer, in said City, and annexed to their said draft this bill of lading which latter was duly transferred and assigned to plaintiff.

The carrier made no delivery of the consignment to anyone; the sight draft was dishonored and Drew & Harvey were subsequently adjudged bankrupts. Thereupon plaintiff, being still the holder and owner of the bill of lading, sued the railroad for the value of the goods.

The defense is that neither the 100 barrels of sugar mentioned in the bill of lading, nor any part of said alleged consignment, were ever delivered to, or received by, the defendant and that

hence neither the said Eaves, nor any other representative of the company had, or could have any authority to sign and issue bills of lading for goods not received, so as to bind the company.

There was judgment for the plaintiff for the amount claimed and the defendant appeals.

That the plaintiff is an innocent and bona fide transferee, for value, of the bill of lading is not seriously questioned, nor can it be successfully denied, for it is abundantly established by the evidence; and that Drews & Harvey never made any such shipment as is recited in the bill of lading and that consequently, no such was ever received by the company, is admitted by the plaintiff without prejudice to his plea of estoppel which is herein set up.

While, generally speaking, a bill of lading duly issued in the usual course of business by the master of a vessel or the authorized agent of a carrier binds the owner of the vessel or the carrier, such master or agent has no authority to issue a bill of lading for goods which have not been received; and, as a consequence, if the party to whom the bill of lading was given had no goods, or goods described in the bill of lading are never delivered to the carrier, the bill of lading so issued, *in his hands,* is of course void and cannot bind the principal. On this proposition all the authorities are agreed. There are, however, many conflicting opinions as to the extent of the liability of carriers towards third persons,—bona fide consignees or assignees for value, into whose hands may come a bill of lading issued by the carrier's agent fraudulently or through mistake or negligence and where no goods have been received for shipment.

In England, at least until the passage of the "Bills of Lading Act," (18 &19 Vic. Chap. 111-3,) making bills of lading in the hands of consignees or endorsees for value, conclusive as to shipment, and beginning with the leading case of Grant vs. Norway, (1851) C. B. Rep. Vol. 10 p. 664, and followed by Coleman, vs. Riches, 16 C. B. 104; Hubbersty, vs. Ward, 8 Exch. 330; Brown, vs. Powell, D. S. Coal Co., L. R. 10, C. P. 562; McLean, vs. Fleming, L. R. 2, Sc. App. Cas. 128; Cox, vs. Bruce, L. R. 18, Q. B. Div. 147; Meyer, vs. Dresser, 15 C. B. N. S. 646; and Jassel & Bath, L. R. 2 Exch. 267, (although there are at least

two other cases, one as early as 1831, and the other as late as 1883, holding the contrary view and which will be referred to infra) the rule is that even as against a bona fide consignee or endorsee for value, the carrier is not estopped by the statement of the bill of lading, issued by his agent, from showing that no goods were in fact received for transportation.

This likewise is the settled doctrine of the Federal Courts; Schooner Freeman, vs. Buckingham, 59 U. S. 182; The Lady Franklin 75 U. S. 325; Pollard, vs. Vintere 105 U. S. 7; St. Louis I. M. & S. R. Co., 122 U. S. 79; and Friedlander, vs. Texas & P. R. Co., 130 U. S. 416. The same rule obtains in North Carolina, 93 N. C. 42; in Missouri, Louisiana Nat. Bk., vs. Laveille, 52 Mo. 380; in Maryland, Baltimore & O. R. Co., vs. Wilkins, 44 Md. 11 and apparently in Ohio, Dean, vs. King, 22 Ohio St. 118.

The reasoning by which this doctrine is usually supported is that a bill of lading is not negotiable in the case in which a bill of exchange or promissory note is negotiable, where the purchaser need not look beyond the instrument itself; that so far as it is a receipt for goods it is susceptible of explanation or contradiction. the same as any other receipt; that the whole question is one of the law of agency; that it is not within the scope of the authority of the shipping agent of a carrier to issue bills of lading where no property. is in fact received for transportation; that the extent of his authority, either real or apparent, is to issue bills of lading for freight actually received; that this real and apparent authority, *id est,* the power with which his principal has clothed him in the character in which he is held out to the world, is the same, viz., to give bills of lading for goods received for transportation and that this limitation upon his authority is known to the commercial world, and therefore any person purchasing a bill of lading issued by the agent of a carrier acts at his own risk as respects the existence of the fact, (the receipt of the goods,) upon which alone the agent has authority to issue the bill, the rule being that if the authority of an agent is known to be open for exercise only in a certain event, or upon the happening of a certain contingency, or the performance of a certain condition, the occurrance of the event, or the

happening of the contingency, or the performance of the condition, must be ascertained by him who would avail himself of the results ensuing from the exercise of the authority. An examination of the authorities also show that they apply the same principle whether the bill of lading was issued fraudulently and collusively or merely by mistake.

A contrary rule, however, has been adopted in Illinois, Tibbits, vs. Rock Island R. R., 49 Ill. 567, St. Louis & I. M. R. Co. 103 Ill. 293; in Kansas, Wichita Sav. Bk., vs. Atchison R. R. 20 Kan. 519; in Nebraska, Seoux City & R. R. Co., vs. First National Bank, 10 Neb. 556; in New York, Armour, vs. Michigan Cent. R. R. Co., 65 N. Y. 111; Bank of Batavia, vs. N. Y. L. E. & W. R. Co., 106 N. Y. 195; in Pennsylvania-Brooke, vs. N. Y. etc. R. R. Co., 108, Pa. 529; and in Conneticut Relyea, vs. New Haven Rolling Mills Co., 42 Conn. 579.

The reasoning of these cases is in substance that the question does not at all depend upon the negotiability of bills of lading, but upon the principle of estopped *in pais* that where a principal has clothed his agent with power to do an act in case of the existence of some extrinsic fact, necessarily and peculiarly within the knowledge of the agent, and of the existence of which the act of executing the power is itself a representation, the principal is estopped from denying the existence of the fact, to the prejudice of a third person, who has dealt with the agent or acted on his representations in good faith in the ordinary course of business; that in view of the fact that bills of lading are viewed and dealt with by the commercial world as quasi negotiable, and consequently it is desirable that they should be viewed with confidence and not with distrust; and that for these considerations it is better to cast the risk of the goods not having been shipped upon the carrier who has placed it in the power of agents of his own choosing to make these representations, rather than upon the innocent consignee or indorsee, who, as a rule, has no means of ascertaining the fact.

In this state the question has been set at rest, in our opinion, by Statute.

The act No. 150 of 1868, after forbidding the execution of warehouse receipts or bills of ladings for goods of merchandise,

unless the same shall have been actually delivered or shipped, and denouncing heavy penalties for .violation of the prohibition, proceeds in its sixth section, to provide that the holder of such receipt or bill of lading shall be decreed the owner of the merchandise described therein.

Section nine declares that bills of lading, not marked "Not negotiable," shall be negotiable by endorsement in blank or by special endorsement, and fixes their legal value to be "to the same *extent* as bills of exchange and promissory notes now are."

The animus of this Statute is unmistakable. It was intended to protect both the carriers and the public, the former by punishing any person in their employ for issuing false bills of lading or receipts and the latter by putting such bills or receipts upon the same footing as commercial paper, and protecting the holder in good faith with all privileges and immunities given to the bills of exchange and promissory notes. Spencer J. in Hunt & Macauley, vs. Mississippi C. Rail, etc, Co. 29 A. at p. 462.

This law was enacted in the interest of commenrce; it created one of the most important branches of our credit; it secures the most legitimate transactions; it sanctioned, legalized and perfected a fair, but more imperfect custom which prevailed before its adoption,, and it is by far wiser and more equitable than the vacillating and doubtful jurisprudence of other States. It guards against carelessness and error, against surprise and deceit, against forgery and fraud. If as to third parties it could be explained or contradicted, the bill of lading, though negotiable, could seldom be negotiated. De Blanc. J. Ibid. at p. 463.

But even if the Statute should not go to the extent here claimed for it we do not hesitate to follow that line of cases which hold that as between the carrier and a third person holding a bill of lading for a valuable consideration, the bill of lading is not open to explanation and correction. We understand this to be the better opinion. The views advanced in these decissions are pursuasive, are in full consonance with our own laws and are best calculated to give security to commerce.

Referring to a few of these cases; we may cite Armour, vs. Michigan Central R. R., 65 N. Y. III. In that case defendant's agent having authority to issue bills of lading, upon delivery to

him by one Michaels of a forged ware house receipt, issued to Michael two bills of lading, each stating the receipt of a quantity of lard consigned to plaintiff in New York, and to be transported and delivered to them. Thereupon, Michael drew his sight drafts on plaintiff to which he attached the bills of lading. These were delivered to a Bank and were forwarded to New York, and the drafts were paid by plaintiffs, on presentation, upon the faith and credit of the bills of lading. In an action upon the bills of lading it was held that defendant was bound by the acts of his agent, the same being within the apparent scope of his authority and that the carrier was estopped from denying the receipt of the lard and that plaintiffs were entitled to recover. To the question whether the defendant is not estopped from setting up a defence to this action that the statements in the bills of lading, known by its agents at the time of making them to be untrue, were in fact false and that no lard was received by the railroad company for or on account of Michaels, the Court said:

> The true answer to this question is not involved in doubt. The well recognized principle that a party who, by his admissions, has induced a third party to act in a particular manner is not permitted to deny the truth of his admissions, if the consequence would be to work an injury to such third party, applies to and governs this case. * * * * * Street having power to issue bills of lading direct to consignees of goods actually in the possession of defendant, and the present bills being in no way distiguishable in form from those which were usually employed, he must, as to the plaintiffs acting in good faith, be considered as having the necessary authority. The representation in the bills were made to anyone who, in the course of business might think fit to make advances on the faith of them. There is thus presented every element necessary to constitute a case of estoppel *in pais,* a representation made with the knowledge that it would be acted on, and subsequent action upon the faith of it to such an extent that it would injure the plaintiff if the representation was not made good."

In Bank of Batavia, vs. R. R. 106, N. Y. 195. (1887), one Weiss was the local freight agent of the defendant corporation, whose duty and authority it was to receive and forward freight over the defendant's road, giving a bill of lading therefor, specifying the terms of the shipment, but having no right to issue such bills except upon the actual receipt of the property for transportation.

He issued a bill of lading for 65 barrels of beans to one Williams, discribing them as received to be forwarded to one Comstock as consignee. Williams drew a draft on the consignee and procured the money upon it of the plaintiff Bank by transferring the bill of lading to secure its ultimate payment. It turned out that no barrels of beans were shipped by Williams, or delivered to the defendant, and that the bill of lading was the product of a conspiracy between Williams and Weiss to defraud paintiff or such others as could be induced to advance their money upon the faith of the false bill. In an action upon the bill of lading the defendant was held liable and in the course of its opinion the Court said:

> "It is a settled doctrine of the law of agency in this State that where the principal has clothed his agent with power to do an act upon the existence of some extrinsic fact necessarily and particularly within the knowledge of the agent, and of the existence of which the act of executing the power is itself a representation, a third person dealing with such agent in entire good faith, pursuant to the apparent power, may rely upon the representation and the principal is estopped from denying its truth to his prejudice. * * * * * While bills of lading are not negotiable in the sense applicable to the commercial paper, they are very commonly transferred as security for loans and discounts, and carry with them the ownership, either general or special, of the property which they describe. It is the natural and necessary expectation of the carrier that they will pass freely from one to another, and advances be made upon their faith, and the carrier has no right to believe, and never does believe, that their office and effect is limited to the person to whom they are first and directly issued.

51

On the contrary, he is bound in law to recognize the validity of transfers and to deliver the property only upon the production and cancellation of the bill of lading.

If he desires to limit his responsibility to a delivery to the named consignee alone, he must stamp his bills "None negotiable," and where he does not do that he must be understood to intend a possible transfer of the bills and to effect the action of such transferees.

In this case the facts go beyond the instances cited, in which an estoppel has been denied because the representations were not made to the party injured.

These are cases in which the representations made were not intended and could not be expected to influence the person who relied upon, and their knowledge of them was described as purely accidental and not anticipated.

Here they were of a different character. The bills were made for the precise purpose, so far as the agent and Williams were concerned, of deceiving the Bank by their representations and the bill was issued with the expectation of the principal that it would be transferred and used in the ordinary channels of business, and be relied upon as evidence of ownership or security for advances. Those thus trusting to it, are not accidentally injured, but have done what they who issued the bill had every reason to expect. Considerations of this character form all the basis of an equitable estoppel without reference to negotiability or directness of representation.

It is obvious, also, upon the case presented that the fact or condition essential to the authority of the agent to issue the bill of lading was one unknown to the Bank and particularly within the knowledge of the agent and his principal.

If the rule compelled the transferee to incur the peril of the existence or absence of the essential fact, it would practically end the large volume of business founded upon transfers of bills of lading. Of whom would the lender inquire and how ascertain the fact? Naturally he would go to the freight agent who had already falsely declared in writing that the property had been received. Is he more authorized

52

to make the verbal representation than the written one? Must the lender get permission to go through the freight house or examine the books? If the property is grain, it may not be easy to identify and the books if disclosed are the work of the same freight agent. It seems very clear that the vital fact of the shipment is one peculiarly within the knowledge of the carrier and his agent and quite certain to be unknown to the transferee of the bill of lading, except as he relies upon the representations of the freight agent."

In Brooke et al, vs. N. Y. Lake Erie & Western R. R. Co., 108 Penn. (State), 529, the carrier's authorized shipping clerk at one of the stations issued a bill of lading in the Company's name for certain goods that the company had never received. The bill of lading came into the hands of an innocent third person who made advances of money upon it. Upon suit being brought against the company to recover such advances by the said third party; held: that the company was estopped by the act of its agent from denying the receipt of the goods, although the clerk had no authority to give bills of lading without receiving the goods, and although the company had never done anything to lead anyone to suppose that he had such authority. It was contended that inasmuch as no authority, real or apparent, to issue bills of lading, without receiving the goods mentioned therein, had actually been given to the agent by the railroad company, it was not in any manner responsible for his unauthorized act, even as to innocent third parties who were misled and injured thereby. To this the Court said:

"We cannot assent to this proposition. As between principal and third parties, the true limit of the agents authority to bind the former is the apparent authority with which the agent is invested; but as between the principal and the agent, the true limit is the express authority or instructions given to the agent (citing Evans Agency 594-606; Adams Ex. Co., vs. Schlessinger, 25 P. F. Smith 246).

The principal is bound by all the acts of his agent within the scope of the authority which he held him out to the world to possess, notwithstanding the agent acted contrary to in-

53

structions; and this is especially the case with officers and agents of corporations. Since a corporation acts only through agents, it is bound by its agents contracts when made ostensibly within the range of their office. One who authorizes another to act for him in a certain class of contracts undertakes for the absence of fraud in the agent within the scope of his authority. The authority of an agent to act for and bind his principal will be implied from the accustomed preformance by the agent of acts of the same general character for the principal with his knowledge and consent, (citing Evans Agency 193 note). These elementary principles are founded on the doctrine that where one of two persons must suffer by the acts of a third person, he who has held that person out as worthy of trust and confidence and as having authority in that matter, should be bound by it. It is conceded in this case that the company did not authorize the issuance of bills of lading without receipt of the goods, but it put the agent in the place to do that class of acts and it should be answerable for the manner in which he conducted himself within the range of his agency. Public policy, as well as the ultimate good of corporations themselves, require that this should be the rule."

To the same effect is Dickerson, vs. Seelye, 12 Barb, (N. Y.) 102; St. Louis etc. R. R. Co., vs. Larned 103 III 293; Stone vs. Wabash etc. R. R. Co. 9 III (App.) 48; Tibbits, vs. Rock Island R. R. 49 III. (App.) 567; Wichita Sav. Bank, vs. Atchison etc. R. R. Co. 20, Kan. 519; Sioux City etc. R. R. Co., vs. Fremont etc. Bank, 10 Neb. 556 (35 Am. Rep. 488.)

On the same principal it was held in Massachusetts that the recital in a bill of lading that the freight was paid in advance, estopped the carrier from proving that the freight had not been paid when the bill was held by a third person. Portland Bank, vs. Stiebbs, 6 Mass. 425; and in Connecticut, that, where a bill of lading called for a larger quantity of goods than was actually received, the carrier, as a third holder of the bill of lading for value, was estopped by the statement and was responsible to the third person for the deficiency. Relyea, vs. New Haven Rolling

54

Mill Co. 42 Conn. 579. Even in England, and as early as the year 1831, and as opposed to Grant, vs. Norway C. B. Rep. Spura, it was held in Howard, vs. Tucker 1 B. & Ad. 712 that where the master has given a bill of lading by which freight appears to have been paid before the ship's departure, he is estopped from as against the assignee of such bill from claiming that the freight has not been paid; and Lord Tenterden said: "that the captain might be answerable to his principals for having signed an instrument which contained an incorrect statement; yet that third persons who took the bill of lading, on the faith of such statement, for a value to which they might otherwise have thought it inadequate, ought not to suffer for it."

In Conventry, Sheppard & Co., vs. The Great Eastern R. R. Co., (1883), Law Rep. II Q. B. Div. p. 776, the defendant had issued, through error, two delivery orders for the same consignment of wheat, both of which orders came into the hands of plaintiffs for value. The railroad, was sought to be held liable on both orders. At the trial Pollock B— was of the opinion that the advice note amounted to an admission by defendants that they held the grain at the disposal of the consignees and that the plaintiff's were entitled to say that the documents must be taken as representing goods actually in defendant's possession and he gave judgment for the plaintiffs.

On appeal Brett, Master of the Rolls, said: The judgment must be affirmed. I can be upheld only on the ground of estoppel, that is that the defendants were prevented by their own conduct from relying upon the fact that there were not two parcels of goods. Lindle, L. J. and Foy, L. J. expressed similar views and the appeal was dismissed.

It is contended by the learned counsel for the defendant that the rule in Grant, vs. Norway has been asserted and maintained by the Supreme Court of this State in Hunt & Macaulay, vs. Mississippi etc. R. R. Co. 29, An. 446.

We do not so read that authority. In that case the question under discussion here elicited, it is true, much *dieta,* but it received no decision. Indeed, this question was not at all present in that case, forasmuch as the Court was of the opinion, at least a major-

55

ity of the Court was of the opinion, that the plaintiffs therein were not the innocent holders for value of the bill of lading, but were simply the agents of the consignee, for whose benefit the suit was brought.

And more than this, but *two* members of the Court gave their approval of the doctrine announced in Grant, vs. Norway; two dissented from that view, and one concurred in the decree rejecting plaintiff's demand, on the ground alone that the real beneficiaries by the action would be, not the plaintiff but the owners and consignees of the goods.

The facts in that case, succinctly stated, are that Hunt & Macaulay of the City of New Orleans, were, and had been for a number of years previously, the commission merchants of J. W. Mitchell & Co., plaintiffs of the State of Mississippi; between whom there existed an open and running account, the latter firm making all shipments of their cotton crops to the former. On a certain occasion one lot of 14 bales of cotton had been shipped by Mitchell & Co. to their merchants aforesaid, and, through error, the carrier issued two sets of bills of lading, therefore each calling for 14 bales. There was delivery to the consignees of but 14 bales of cotton, it being contended and established that this constituted the whole consignment and that as the carrier had not received any additional lot of 14 bales it was not bound by the receipt or bill of lading thus issued by its agent. There was judgment below in favor of the plaintiff and on appeal the judgment was reversed, three of the judges concurring in the decree. The decree was announced by Mr. Justice Marr for the Court, and in the course of his opinion, and after stating the facts, he concluded that Mitchell & Co., the consignors, were the real parties in interest, and not Hunt & Macaulay, the consignees and plaintiffs in the cause. We quote from his opinion showing that this was the conclusion reached by him:

> "Plaintiffs were the factors, the agents of Mitchell & Co. and this relation between them was not a new one. The cotton belonged to Mitchell & Co., and when it went into

56

the hands of plaintiffs they were entitled to retain the proceeds on account of their advances.

If the cotton had been damaged or lost in transit, or at any time before the sale and delivery by the plaintiffs, the loss would have fallen on Mitchell & Co. and not on plaintiffs. The cause, therefore, with which we are dealing *is not that of a stranger making a shipment and obtaining advances or selling goods to arrive on the mere showing of the bill of lading.* It is the case of a principal who, for two reasons at least, has been shipping his property for sale for his account to his regular consignee and agent, in the course of a regular and continuous business, and who, in the course of that business, sends the evidence of a single shipment larger than that actually made at that time, and who, it may be, obtains a larger advance thereby than would otherwise have been made at that time. This consignee, holding the bill of lading, might indeed sue the carrier, in his own name, for short delivery, *but the suit would be in reality for the benefit of the shipper, the owner, and the consignee could only exercise, as agent, the right of his principal, and recover upon the contract to the same extent as the principal might have done in a suit in his own name.*

*So far as this branch of the case is concerned the question is, not whether a stranger, the innocent holder for value of a bill of lading may recover of the carrier for short delivery, but whether the owner of the property, the shippers, Mitchell & Co., who had full knowledge of the mistake in the bills of lading, who could not have been ignorant of the quantity or the marks of their own cotton, are to be allowed to take advantage of this mistake on the part of the station agent, by which they were not deceived, and which occasioned to them no loss or diminution of property. . Can the carrier be compelled to pay so much of the debt of Mitchell & Co. to the plaintiffs as would have been paid if Mitchell & Co. had actually shipped the cotton which they did not ship and which they did not have to ship?*

P. 449–50 (*Italics Ours.*)

Notwithstanding this clear and explicit finding that the plain-

tiffs were not to be regarded as innocent third persons, but simply as the agents of the consignors, and that hence the question was not "whether a stranger the innocent holder for value of a bill of lading may recover of the carrier for short delivery," Mr. Justice Marr proceeds to discuss the law as to such third persons, cites Grant, vs. Norway, and the decision of the Federal Courts following the rule in that case, expresses his approval thereof and adopts same as decissive of the case then under consideration.

This opinion was concurred in by Mr. Chief Justice Manning; Mr. Justice Egan concurring in the decree for the sole reason that he considered, to quote his language: "Mitchell & Co. to be the sole beneficiaries by this action;" adding: "We cannot consider plaintiffs as third persons in this matter."

Mr. Justice Spencer and Mr. Justice DeBlanc dissented in exceedingly vigorous and personative opinions, declining to follow the doctrine taught by Grant, vs. Norway; declaring that to do so its effect would be "to destroy all confidence upon which commerce depends," affirming the opinion that the better opinion is that as between the shipper and carrier a bill of lading is open to explanation and correction; but that as between the carrier and a third person holding it for a valuable consideration it is not," and concluding that at any event such third person is protected by both the spirit and the letter of the Act of 1868.

Discussing the purpose and effect of this Statute Mr. Justice DeBlanc said:

> "Instead of giving out the bill of lading for twenty-three bales of cotton actually delivered, defendant's acknowledged agent gave two bills of lading, one in December, 1869, the other in January, 1870, for altogether thirty-three bales.
>
> "In the course of their usual business, on the faith of these bills of lading, plaintiffs advanced the full value of the cotton which the agent thus declared to have been received and shipped.
>
> "For every act of the agent performed by him within the scope of his authority the principal is bound. In this case, the bill of lading was signed by one expressly employed to

sign these bills. For his errors who must suffer? Is it those who, deceived by error, have disbursed and advanced their money, or is it the principal, who vouched for and guaranteed a proper and correct exercise. of the delegated authority, a strict and faithful discharge of every duty imposed by the mandate? The principal's signature to the bill of lading would not have more effectually bound him than did the signature of his chosen, his recognized, agent.

"He is bound under the general rule, he is also bound under the Act of 1868. Under that act the bill of lading, as a bill of exchange or a promissory note, may be transferred by indorsement, and any person to whom the same may be transferred shall be deemed and taken to be the owner of the produce or commodity thereon specified, so far as to give validity to any pledge, lien, or transfer made or created by the holder of the same. That no printed or written condition or clause inserted or attached to any bill of lading, which in any way limits the liability imposed by the act, shall have any effect or force whatsoever.

"Through its agent, the railroad company certified to plaintiff's that thirty-three bales of cotton had been shipped. On transfer to them of that certificate they advanced the entire value of the cotton, which, according to the agent's declaration, had been delivered to, received and shipped by defendant. If, under these circumstances, the company is not liable, a carrier's agent, without receiving a single bale of cotton, may attest that he has received one thousand bales, discount the bill of lading, retain the proceeds of the discount, do this under color and by virtue of his agency, and not bind his principal.

"In this case there was no intention of deceiving plaintiffs. This we admit, but, so far as third parties are concerned, what difference would there be between the error or fraud of an agent? If not liable for the error, the company would not be liable for the fraud, and the bill of lading would lose its value, become a snare, a suspected and dangerous instrument.

"To decide the question presented, it is useless, it seems, to refer to the jurisprudence of other States. We have but to open and read the statute of 1868. It was enacted for the express purpose of fixing, in and for Louisiana, the legal value of a bill of lading. With the provisions of that law planters and merchants are now conversant. The bill of lading has the value of a sale, the stipulation of which cannot be changed, cannot be limited, except in one way, that indicated in the statute, that is by the words, "Not Negotiable" plainly written or stamped on its face. No other reservation, written or printed, shall have any force or effect whatsoever. These are the terms of the statute.

"The law of 1868 was enacted in the interest of commerce; it created one of the most important branches of our credit; it secures the most legitimate transactions; it sanctioned, legalized and perfected a fair, but imperfect, custom which prevailed before its adoption, and it is by far wiser and more equitable than the vacillating and doubtful jurisprudence of other States. It guards against carelessness and error, against surprise and deceit, against forgery and fraud. If, as to third parties, it could be explained or contradicted, the bill of lading, though negotiable, could but seldom be negotiated.

"If, as provided in the law of 1868, the carrier cannot take advantage of any written or printed reservation attached in advance to a bill of lading, or a reservation apparent to all, how could it be allowed to take advantage of that which not only is not written, printed or apparent, but which, if admissible or admitted in evidence, would entirely or partially contradict the absolute terms, the positive figures of a bill of lading? For instance, were the agent to write across the bill the declaration that the principal is not responsible for the quantity thereon specified, would that declaration justify the delivery of less than the expressed quantity? Most assuredly not.

"As to the holder of a bill of lading, the only inquiries should be, does the instrument bear the signature of a real, a recognized, a proper agent? If it does, then did that rec-

ognized agent appear to have acted within the scope of the delegated authority? If he did, the instrument, whether delivered through error or fraud, is binding on the carrier. The error of fraud of an agent is not to be visited on the victims of his negligence or infidelity, but on those who created the trust, otherwise the negotiable instrument shall cease to be, as it now is, a letter of credit, a proclamation, to every purchaser or transferee, that all it contains is right.

"For these, and the reasons by him alleged, I concur in the opinion delivered by His Honor, Mr. Justice Spencer."

In the opinion prepared by Mr. Justice Marr there is cited two Louisiana cases as sustaining the views expressed by him; these are Feam vs. Richardson 12 A., p. 752, and Fellows vs. Steamboat Powell, 16 A., 216. Neither of these cases sustain him. In the first the carrier was not a party to the suit, no claim being set up against him on the false bill of lading at all. It was a suit between a principal and his agent, wherein the former sought to hold the latter responsible for goods which his agent had purchased for him, and which were to be shipped to him, and which the agent had represented had been shipped and which had never been received by the principal. The agent's defense was that he had obtained from the Steamboat Republic a bill of lading for these goods, which bill of lading he had transmitted to the plaintiff (his principal), who still held same, and that hence the latter must look to the carrier for the goods or its value and not to him, the agent. It was shown that the carrier had never received the goods described in the bill of lading. The Court rejected this defense, and held the agent responsible for the shipment. Under these facts it is obvious that the controlling reasons influencing this decision was that as the carrier was not bound by the false bill of lading issued by its agent, therefore the consignor was responsible, and that the reason why the carrier was not bound by it to either the consignor or to the consignee was because neither of them were "innocent third person"— both of them, in instrument of law, being the original parties, consignees, as their relation was that of principal and agent.

In the second case cited (16 A, 316) the suit was between orig-

inal parties, the consignee and the carrier. It will be thus perceived that the question presented in the instant cause has never received decision by our Supreme Court and that hence the question is *res novo* in this jurisdiction.

Persuaded that, as before stated, the act of 1868 resolves the question against the carrier, and that, in any event, the better opinion is that expressed in Armour vs. Michigan Central R. R., 65 N. Y., 111, and by the highest courts of a number of our sister states, and cited *supra,* to the effect that the carrier is estopped from explaining or contradicting a bill of lading in the hands of an innocent assignee for value, the judgment must be affirmed.

It is therefore ordered, adjudged and decreed that the judgment appealed from be and the same is hereby affirmed.

Nov. 27, 1905.

Rehearing refused Dec. 11, 1905.

Writ granted by Supreme Court Jan. 24, 1906.